IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – CHANCERY DIVISION

| | |
|---|---|
| SABRINA WHEELER, on behalf of herself and all others similarly situated, | 2016CH06075 CALENDAR/ROOM 10 TIME 00:00 Class Action |
| Plaintiff, | Civil Action No. |
| v. | JURY TRIAL DEMANDED |
| THE QUAKER OATS COMPANY, | |
| Defendant. | |

2016 MAY -2 PM 12:29
DOROTHY BROWN CLERK
FILED

**CLASS ACTION COMPLAINT**

Plaintiff SABRINA WHEELER ("Plaintiff"), on behalf of herself and all others similarly situated, through her undersigned counsel, hereby files this Class Action Complaint for Equitable Relief and Damages, against Defendant The Quaker Oats Company ("Quaker"), and alleges as follows:

1.      Defendant aggressively advertises and promotes its oatmeal products as "100% Natural," and claims its oats are grown using "eco-friendly" methods that pose "less risk of pollutants and groundwater pollution." These claims are false, deceptive, and misleading. Quaker Oats are not "100% Natural," but instead contain the chemical glyphosate, a potent herbicide that last year was declared a probable human carcinogen by the cancer research arm of the World Health Organization. Glyphosate makes its way into Quaker Oats not simply because it is used as an agricultural weed killer, but because it is sprayed on the oats as a drying agent shortly before harvest.

2.     There is nothing unlawful about Quaker Oats' growing and processing methods. What is unlawful is Quaker's claim that Quaker Oats is something that it is not in order to capitalize on growing consumer demand for healthful, natural products.

3.     Plaintiff Wheeler brings this deceptive advertising case on behalf of a class of consumers who purchased Quaker Oats in Illinois, and seeks relief including refunds to purchasers for the falsely advertised products and a court-ordered corrective advertising campaign to inform the public of the true nature of Quaker's carcinogen-contaminated oats.

## INTRODUCTION

4.     This is a proposed consumer protection class action against Quaker for injunctive relief and economic damages based on misrepresentations and omissions committed by Quaker regarding certain varieties of its products, which Quaker falsely and deceptively labels and markets as "Natural," "100% Natural," "100% Natural Whole Grain," and "Heart Healthy" or "part of a heart healthy diet." The products are not "Natural," "100% Natural," or "100% Natural Whole Grain" as labeled and marketed. In fact, the products contain glyphosate, a potent and *unnatural* biocide.

5.     Specifically, the products at issue are: (1) Quaker Oats Old-Fashioned, (2) Quaker Oats Quick 1-Minute, and (3) Quaker Steel Cut Oats (collectively, "Quaker Oats," or the "Products").

6.     Aware of the health risks and environmental damage caused by chemical-laden foods, especially packaged foods, consumers increasingly demand foods that are natural and whole, and that omit chemicals.

7.     Quaker knows that consumers seek out and wish to purchase whole, natural foods that do not contain chemicals, and that consumers will pay more for foods that they believe to be natural than they will pay for foods that they do not believe to be natural.

2

8.     To capture this growing market, Quaker labels its Quaker Oats products as "100% Natural Whole Grain." Quaker also states, on the front labels of its Quaker Oats Old Fashioned product, "As part of a heart-healthy diet, the soluble fiber in Oatmeal can help reduce cholesterol." The back of its Quaker Oats Old Fashioned label advises consumers, "Get your day off to a Heart Healthy Start with Whole Grain Quaker Oatmeal!" *See* Ex. 1 (product labels).

9.     The only ingredient listed on Quaker's "100% Natural Whole Grain" Quaker Oats products is "100% Natural Whole-Grain Quaker Quality Rolled Oats." *See* Ex. 1 (product labels).

10.     No reasonable consumer, seeing these representations, would expect Quaker Oats to contain anything unnatural, or anything other than whole, rolled oats.

11.     Quaker Oats, despite their labels, do contain something other than whole, rolled oats; namely, Quaker Oats contain glyphosate.

12.     Glyphosate is not "Natural" or "100% Natural." Glyphosate is a synthetic biocide and probable human carcinogen, with additional health dangers rapidly becoming known.

13.     Glyphosate is "legal" in connection to food products, insofar as the law does not preclude the use of glyphosate in treating and harvesting crops. Quaker, however, did not and does not simply claim that its Quaker Oats are "legal"; it claims that Quaker Oats are "Natural" and contain "100% Natural Whole Grain" and nothing else. *See* Exhibit 1.

14.     By deceiving consumers about the nature, quality, and/or ingredients of its Quaker Oats, Quaker is able to sell a greater volume of Quaker Oats, to charge higher prices for Quaker Oats, and to take away market share from competing products, thereby increasing its own sales and profits.

3

15.     Consumers lack the scientific knowledge necessary to determine whether Quaker Oats in fact contain only "100% Natural Whole Grain," to know or to ascertain the true ingredients and quality of Quaker Oats, or to assess the safety of ingesting glyphosate. Reasonable consumers must and do rely on Quaker to report honestly what Quaker Oats contain, and whether the ingredients in fact are "Natural" or "Heart Healthy."

16.     Quaker further hides the fact that the oats contain a modern biocide by marketing some Quaker Oats as "Old Fashioned," and all Quaker Oats under a picture of a man dressed in Colonial-era attire.

17.     Across all Quaker Oats products, Quaker conceals the presence of glyphosate, fails to warn consumers of the presence of glyphosate, and fails to warn consumers about the harmful effects of ingesting glyphosate.

18.     Should any consumer seek further information, Quaker's own website declares that Quaker Oats are "a healthful and tasty ingredient to many recipes." http://www.quakeroats.com/products/hot-cereals/old-fashioned-oats.aspx (last visited April 26, 2016). Quaker's website further promotes the health benefits of Quaker Oats, stating: "Even better, the goodness doesn't stop with the taste; Quaker Oats is 100% whole grains which may help reduce the risk of heart disease." *Id.* (last visited April 26, 2016).

19.     Quaker intended for consumers to rely on its representations, and reasonable consumers did in fact so rely. As a result of its false and misleading labeling, failure to warn, and omissions of fact, Quaker was able to sell Quaker Oats to hundreds of thousands of consumers throughout the United States and to realize sizeable profits.

20.     Plaintiff is not seeking damages for any personal injuries in this Complaint[1]; rather, this case is based on Defendant's misrepresentations and omissions regarding the Quaker Oats Products purchased by Plaintiff and Class Members during the class period, defined below.

21.     Plaintiff and numerous other Class Members who purchased the Products suffered economic damages in a similar manner because they purchased, purchased more of, or paid more for Quaker Oats than they would have had they known the Products were not "Natural" or "100% Natural" as labeled and marketed. When a product purports to be "100% Natural," consumers not only are willing to pay more for the product, they expect it to be pesticide-free. Had Plaintiff and Class Members known at or before the time of purchase that the Products in fact contained glyphosate, a synthetic biocide and probable human carcinogen, they would not have purchased or used the Products, and they will not continue to use them unless and until remedial action is taken.

22.     Plaintiff, and all others similarly situated consumers, did not bargain for Products that contain unnatural ingredients in exchange for their payment of the purchase price. Plaintiff contends that the Products are not "Natural" or "100% Natural Whole Grain" as labeled and marketed, and as a result, such representations mislead consumers into purchasing the Products.

23.     The Products are sold pursuant to unlawful trade practices because they offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

24.     Accordingly, Plaintiff seeks relief equal to the aggregate retail purchase price paid by Plaintiff and Class Members during the Class Period, because the Products are worthless and useless due to Quaker's misrepresentations regarding the true nature, quality, and ingredients of

---

[1] All potential claims for individual tort relief by Plaintiff and Putative Class Members are preserved and outside the scope of the damages sought in this litigation.

the Products and its failure to warn consumers of the presence of glyphosate and the harmful effects of ingesting glyphosate.

25.     Plaintiff Wheeler brings this action to stop Quaker's deceptive and misleading practices.

## PARTIES

26.     Plaintiff Sabrina Wheeler is a citizen of the State of Illinois and resides in Dolton, Cook County, Illinois. Throughout the Class Period, Plaintiff has regularly purchased Quaker Oats Old Fashioned for her personal use at a Food 4 Less retail store located at 1000 East Sibley Boulevard, Dolton, Illinois, and an Ultra Foods retail store located at 16831 Torrence Avenue, Lansing, Illinois. Throughout the Class Period, Plaintiff received and relied upon Quaker's false and misleading statements as alleged below.

27.     Defendant Quaker Oats Company is a Chicago, Illinois-based division of PepsiCo, Inc., a North Carolina corporation headquartered in Purchase, New York, and one of the world's largest food and beverage companies. Quaker's principal place of business is 555 West Monroe Street, Chicago, Illinois. At all relevant times, Quaker has regularly and systematically conducted business in this County.

28.     In deciding to purchase Quaker Oats, Plaintiff Wheeler saw, relied upon, and reasonably believed Quaker's representations that Quaker Oats are natural and healthful, and comprise only "100% Natural Whole Grain," are "Heart Healthy," and are "part of a heart healthy diet."

29.     When a product purports to be "100% Natural," consumers not only are willing to pay more for the product, they expect it to be pesticide-free.

30.     Plaintiff Wheeler was willing to pay more for Quaker Oats because she expected the Products to be pesticide-free. Had Plaintiff Wheeler known at the time that Quaker Oats contain the unnatural biocide glyphosate, she would not have purchased or continued to purchase Quaker Oats.

31.     Had Plaintiff Wheeler known at the time that Quaker Oats contain the unnatural biocide glyphosate, she would not have purchased or continued to purchase Quaker Oats.

32.     Had Plaintiff Wheeler been warned of the dangers of ingesting glyphosate, and of the presence of glyphosate in the Quaker Oats, she would not have purchased or continued to purchase Quaker Oats.

33.     If Quaker Oats were reformulated such that Quaker's representations were truthful, i.e., such that Quaker Oats contained only "100% Natural Whole Grain" and no glyphosate, Plaintiff Wheeler would consider purchasing Quaker Oats in the future.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over this class action under 735 ILCS 5/2-209(a), 5/2-209(b) and 5/2-209(c) of the Illinois Code of Civil Procedure.

35.     Plaintiff is a citizen and resident of Illinois.

36.     Defendant is a citizen of Illinois with its principal offices in Illinois.

37.     All of the members of the proposed Class are citizens of Illinois.

38.     The principal injuries resulting from Defendant's alleged unlawful conduct were suffered in Illinois.

39.     Upon information and belief, during the three-year period preceding the filing of this class action, no other class action has been filed asserting the same or similar allegations against the Defendant.

40.     Venue is proper in this Court under 735 ILCS 5/2-101 because Defendant's principal offices are in this judicial district, and the transactions from which these claims arose took place in this judicial district.

## FACTUAL ALLEGATIONS

41.     American consumers increasingly and consciously seek out natural and healthful food products. Once a small niche market, healthful, natural foods are now sold by conventional retailers, and their sales continue to soar. The trend toward natural and healthful food products includes, for many consumers, a preference for whole grains over processed or otherwise refined grains.

42.     Consumers value natural foods, including whole grains, for myriad health, environmental, and political reasons, including avoiding chemicals and/or additives, attaining health and wellness, helping the environment, and financially supporting companies that share these values.

**I.     Quaker's Brand Image: Natural, "Green," and Environmentally Conscious.**

43.     Hoping to capture this growing market, Quaker markets Quaker Oats as a natural and healthful choice containing only "100% Natural Whole Grain." Quaker does not disclose the presence in Quaker Oats of anything other than "100% Natural Whole Grain."

44.     Quaker cultivates its image as a healthful, wholesome, impurity-free brand—the kind of company whose label claims can be trusted. Indeed, Quaker advertises its Quaker Oats with the "image of a man dressed in the Quaker garb... because the Quaker faith projected the values of honesty, integrity, purity and strength." http://www.quakeroats.com/about-quaker-oats/content/quaker-faq.aspx (last visited April 26, 2016).

45.     Quaker also presents itself as a leader in environmental responsibility. On its website, Quaker asserts, "As part of Quaker's holistic approach to environmental sustainability, we have taken special interest in our milling and manufacturing processes." http://www.quakeroats.com/oats-do-more/for-your-world/oats-and-the-environment/innovations-in-milling-and-manufacturing (last visited April 26, 2016).

46.     Quaker also presents itself as an expert source of information on oats—touting their health benefits and environmentally friendly properties. Quaker's website headlines the "Quaker Oats Center of Excellence," billed as "advancing the unique benefits of the oat" with a "Scientific Advisory Board comprised of prominent experts in science, agricultural sustainability, product innovation and consumer insights." http://www.quakeroats.com/about-quaker-oats/content/quakeroats-center-of-excellence.aspx (last visited April 26, 2016); http://www.quakeroats.com/about-quaker-oats/content/quakeroats-center-of-excellence/meet-the-experts.aspx (last visited April 26, 2016).

47.     Quaker claims that it possesses unique expertise in oat cultivation by its status as the world's largest miller of oats:

> At Quaker, we know our oats. Having worked with farmers for over 70 years, we have high standards for our growers. But we appreciate the farmers who have helped us become the world's largest miller of oats, and have worked with them over the years to implement new changes and innovations in the way they farm their land.
>
> While the health benefits of oats are well documented, many people will be surprised to learn about the numerous environmental advantages associated with this humble grain. Oats provide benefits to the environment that are surprising from such an unassuming grain.

http://www.quakeroats.com/oats-do-more/for-your-world/oats-and-the-environment/growing-our-oat (last visited April 26, 2016). Quaker's website goes on to assert that cultivating oats

reduces the risk of ground- and surface-water contamination and, because oats require less tilling, reduces soil's susceptibility to erosion. *See id.*

48.     Quaker asserts, specifically, that cultivating oats *reduces* the use of herbicides that risk pollution and groundwater contamination: "Since oats require less herbicide spray than many other grains, there is less risk of pollutants and groundwater contamination," *id.*, further creating the impression in reasonable consumers that Quaker Oats are "100% Natural" products in which they will not find herbicides.

49.     Quaker also suggests that purchasing Quaker Oats is a "green" choice, and that Quaker Oats are "eco-friendly." Its website links to Facebook "conversations" with topics like, "What are some of your tips for living a 'greener' life?" and runs polls like, "What's preventing you from buying 'eco-friendly' products?" *See* http://www.quakeroats.com/oats-do-more/for-your-world/oats-and-the-environment (last visited April 26, 2016).

50.     Indeed, Quaker presents itself as a "green" organization from top to bottom:

> Quaker is working to incorporate sustainability practices into every facet of its operation. From the corporate level to employee sponsored grassroots organizations, we are dedicated to reducing our impact on the environment.
>
> [. . .]
>
> Our employees reflect and help drive Quaker's commitment to "green" practices. . . .
>
> At every level of Quaker, we are committed to improving our environmental practices throughout every step of our business. Whether it's how our products are packaged and shipped or the types of cups our employees use in the breakroom, Quaker is thinking about how best to implement positive change within the world. http://www.quakeroats.com/oats-do-more/for-your-world/oats-and-the-environment/we-are-living-change (last visited April 26, 2016).

51.     Quaker also promotes the health benefits of its products, explaining, "With the growing number of people who are overweight or obese in America, it is now more important

10

than ever that we educate ourselves about the foods that we are eating and their nutritional content." http://www.quakeroats.com/oats-do-more/for-your-health/healthy-eating/what-to-look-for-when-reading-food-labels (last visited April 26, 2016).

52.     Nowhere on its website does Quaker mention the presence of glyphosate in Quaker Oats.

53.     Nowhere on its website does Quaker warn of the health risks of ingesting glyphosate.

54.     Nowhere on its website does Quaker explain the environmental risks presented by glyphosate.

## II.     Quaker Oats: Presented as "100% Natural" and "Heart Healthy."

55.     Quaker prominently labels its Old Fashioned Quaker Oats product as "100% Natural Whole Grain" that is "part of a heart-healthy diet." These representations appear on the front label of the product. Should any consumer seek additional information from the back of the label, Quaker lists the product's ingredients as not only "100% Natural" but also of a particular quality: "100% Natural Whole Grain Quaker Quality Rolled Oats."

56.     Quaker prominently labels its Quick 1-Minute Quaker Oats product as "100% Natural Whole Grain" that is "Heart Healthy." These representations appear on the front label of the product. Should any consumer seek additional information from the back of the label, Quaker lists the product's ingredients as not only "100% Natural" but also of a particular quality: "100% Natural Whole Grain Quaker Quality Rolled Oats."

57.     Quaker prominently labels its Quaker Steel Cut Oats product as "Hearty 100% Natural Whole Grain Oats" that is "part of a heart healthy diet." These representations appear on the front label of the product. Should any consumer seek additional information from the back of

11

the label, Quaker lists the product's ingredients as not only "100% Natural" but also of a particular quality: "100% Natural Whole Grain Quaker Quality Steel Cut Oats."

58.     Upon information and belief, Quaker has profited enormously from its fraudulently marketed products and its carefully orchestrated label and image.

59.     Representing that a product is "Natural," "100% Natural," "100% Natural Whole Grain," or "Healthy" is a statement of fact.

60.     Failing to disclose that a product contains glyphosate and failing to warn of the dangers of ingesting glyphosate are omissions of relevant fact.

61.     Quaker further enhances the image of a natural, wholesome product by marketing some Quaker Oats as "Old Fashioned," and all Quaker Oats under a picture of a man dressed in Colonial-era attire.

62.     Consumers reasonably believe that a product labeled "Natural" or "100% Natural" does not contain synthetic ingredients.

63.     Consumers reasonably believe that a product labeled "Natural" or "100% Natural" does not contain pesticides.

64.     In 2014, the Consumer Reports® National Research Center conducted a nationally representative phone survey to assess consumer opinion regarding food labeling. *See* http://www.greenerchoices.org/pdf/consumerreportsfoodlabelingsurveyjune2014.pdf (last visited April 21, 2016).

65.     Sixty-six percent of all respondents in the Consumer Reports survey said that a "natural" label on packaged and processed foods means that "no toxic pesticides were used." Eighty-six percent of respondents said that a "natural" label on packaged and processed foods *should* mean that "no toxic pesticides were used." See *Id.*

12

66. Consumers reasonably believe that a product labeled "100% Natural Whole Grain," especially a product whose only ingredient is listed as "100% Natural Whole-Grain Quaker Quality Rolled Oats," does not contain anything other than natural oats.

67. Quaker knows and intends that when consumers see labels promising that a product is "Natural," "100% Natural," or "100% Natural Whole Grain," consumers will understand that to mean that, at the very least, the product does not contain synthetic ingredients or harmful chemicals.

68. Referring to its "Old Fashioned" and "Quick Oats" products, Quaker's website states that "100% Natural" "means these products do not contain any artificial or synthetic ingredients, just oats." *See* https://cu.pepsico.com/quaker (last visited April 27, 2016).

69. Consumers reasonably expect that if a product contains a harmful substance, the presence of that substance will be disclosed, and they will be warned of the dangers associated with the substance.

III. **Glyphosate: The Unnatural Hidden Substance.**

70. Quaker's representations that Quaker Oats are "Natural," "100% Natural," or "100% Natural Whole Grain" are false. In fact, when tested, quantitative testing revealed that Quaker Oats contain glyphosate.

71. Quaker Oats thus are not "Natural" or "100% Natural," and do not contain "100% Natural Whole Grain," and labeling them as such is misleading and deceptive.

72. Because glyphosate is a probable human carcinogen, Quaker Oats thus are not "Healthy" or "Heart-Healthy." Moreover, despite Quaker's "Heart-Healthy" claims, the presence of glyphosate in Quaker Oats reduces the level of beta glucan, a soluble fiber linked to improvements in cholesterol levels and cardiovascular health. Under U.S. Food and Drug

13

Administration regulations, the permissibility of a manufacturer's "heart healthy" claims depends, in part, on the level of soluble fibers such as beta glucan in a product.[2]

73.     Quaker thus has a duty to disclose the presence of glyphosate and to warn of the dangers associated with glyphosate.

74.     On information and belief, glyphosate is, by volume, the world's most widely produced herbicide.

75.     In 2015, the International Agency for Research on Cancer ("IARC"), a research arm of the World Health Organization, declared glyphosate a category 2A "probable" human carcinogen. A summary of the study underlying this declaration was published in *The Lancet Oncology*, Vol. 16, No. 5 (May 2015).[3] The IARC study noted such carcinogenic risk factors as DNA damage to human cells resulting from exposure to glyphosate. *See id.* Glyphosate has been previously found to be a suspected human endocrine disruptor, with estrogenic effects even at extremely low concentrations.[4]

76.     Glyphosate, as a biocide, functions by disrupting the shikimate pathway.[5] Although humans themselves do not have a shikimate pathway, the shikimate pathway is present

---

[2] *See*
http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm0
64919.htm (last visited April 26, 2016).

[3] Available at http://www.thelancet.com/journals/lanonc/article/PIIS1470-2045%2815%2970134-8/abstract (last visited April 26, 2016).

[4] *See* Thongprakaisang, S. *et al.*, "Glyphosate induces human breast cancer cells growth via estrogen receptors," 59 *Food & Chem. Toxicol.* 129 (June 2013), *abstract available at* http://www.ncbi.nlm.nih.gov/pubmed/23756170 (last visited April 26, 2016); *see also, e.g.*, Gasnier, C. *et al.*, "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines," 262(3) *Toxicology* 184 (Aug. 21, 2009), *abstract available at* http://www.ncbi.nlm.nih.gov/pubmed/19539684 (last visited April 26, 2016).

[5] *See, e.g.*, Heike, H. & N. Amrhein, "The Site of the Inhibition of the Shikimate Pathway by Glyphosate," *Plant Physiol.* 66:823 (1980), *available at* http://www.plantphysiol.org/content/66/5/823.full.pdf (last visited April 26, 2016); *see also* http://www.glyphosate.eu/glyphosate-mechanism-action (last visited April 26, 2016).

in bacteria, including bacteria that inhabit the human gut and are essential to proper immune functioning. Glyphosate thus is suspected to disrupt human immune function as well.

77.     Studies examining low doses of glyphosate-based herbicides at levels that are generally considered "safe" for humans show that these compounds can nevertheless cause liver and kidney damage.[6]

78.     Glyphosate is derived from the amino acid glycine. To create glyphosate, one of the hydrogen atoms in glycine is artificially replaced with a phosphonomethyl group.

79.     Glyphosate is not "Natural."

80.     Glyphosate is neither "100% Natural" nor present in "100% Natural Whole Grain."

81.     On information and belief, glyphosate is used to increase oat harvest for commercial purposes; is not necessary to successful planting, growing, or harvesting of oats; is not a "natural" method of growing or harvesting oats; is applied to oats as a drying agent shortly before harvest; and is applied for commercial purposes only.

82.     Glyphosate is a dangerous substance, the presence and dangers of which should be disclosed.

---

[6] Myers, J. et al, "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement." *See also* Seralini G.E., et al, "Republished study: long-term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize," *Environ. Sci. Europe* 2014;26:14, available at http://enveurope.springeropen.com/articles/10.1186/s12302-014-0014-5 (last visited April 20, 2016); Benedetti A.L., "The effects of sub-chronic exposure of Wistar rats to the herbicide Glyphosate-Biocarb, *Toxicol. Lett.* 2004;153(2):227–232, available at http://www.ncbi.nlm.nih.gov/pubmed/15451553 (last visited April 20, 2016); Larsen K. et al, "Effects of Sublethal Exposure to a Glyphosate-Based Herbicide Formulation on Metabolic Activities of Different Xenobiotic-Metabolizing Enzymes in Rats," *Int. J. Toxicol.* 2014, available at http://www.ncbi.nlm.nih.gov/pubmed/24985121 (last visited April 20, 2016); Mesnage R. et al, "Transcriptome profile analysis reflects rat liver and kidney damage following chronic ultra-low dose Roundup exposure," *Environ. Health* 2015;14:70, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4549093/ (last visited April 20, 2016).

IV.    Quaker's Misleading Labeling and Omissions.

83.    Quaker's conduct in labeling Quaker Oats "Natural," "100% Natural," and "100% Natural Whole Grain" deceived and/or was likely to deceive the public. Consumers were deceived into believing that the listed ingredients were all the ingredients, and that the product was "Natural" and "100% Natural," and that nothing in Quaker Oats was not "Natural." Instead, Quaker Oats contain glyphosate, an unnatural biocide and probable human carcinogen, with a myriad of other potential health effects.

84.    Consumers cannot discover the true nature of Quaker Oats from reading the label. Consumers could not discover the true nature of Quaker Oats even by visiting Quaker's website, which makes no mention of glyphosate. Discovery of the true nature of the ingredients requires knowledge of chemistry and access to laboratory testing that is not available to the average reasonable consumer.

85.    Quaker deceptively and misleadingly conceals material facts about Quaker Oats, namely, that Quaker Oats are not "Natural" or "100% Natural," because in fact they contain glyphosate; and that Quaker Oats are not what a reasonable consumer would consider "Natural" or "100% Natural," because in fact they contain glyphosate.

86.    Quaker fails to warn consumers of the dangers of consuming glyphosate.

87.    Plaintiff and the members of the Class are not at fault for failing to discover Quaker's wrongs earlier, and had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice.

88.    The production process Quaker uses for Quaker Oats is known only to Quaker and its suppliers. Quaker has not disclosed such information to Plaintiff or the Class Members. Testing reveals the presence of glyphosate in Quaker Oats, but only Quaker knows the methods

by which its oats are grown, harvested, and processed, or what would account for the presence of glyphosate in Quaker Oats. Quaker's concealment tolls the applicable statute of limitations.

89. To this day, Quaker continues to conceal and suppress the true nature, identity, source, and production method of Quaker Oats.

**V.    Quaker Knew, or Should Have Known, That Its Representations Were False.**

90. Quaker holds itself out to the public as a trusted expert in the growing, harvesting, and processing of oats.

91. Quaker knew what representations it made on the labels of Quaker Oats. It also knew how the oats were grown, harvested, and processed, and that they were likely to contain glyphosate, an unnatural and dangerous herbicide.

92. Quaker thus knew all the facts demonstrating that Quaker Oats were mislabeled and falsely advertised, and that it had a duty to disclose the presence of glyphosate and to warn consumers about the dangers associated with glyphosate.

**VI.    Quaker Intended for Consumers to Rely on Its Misrepresentations.**

93. Quaker made the false, deceptive, and misleading representations and omissions intending for Plaintiff and the Class Members to rely upon these representations and omissions in purchasing Quaker Oats.

94. In making the false, misleading, and deceptive representations and omissions at issue, Quaker knew and intended that consumers would purchase the Quaker Oats when consumers would otherwise purchase a competing product.

95. Consumers are not only willing to pay more for a product that purports to be "100% Natural" – they expect that product to be pesticide-free.

96. In making the false, misleading, and deceptive representations and omissions at issue, Quaker also knew and intended that consumers would pay more for "Natural" or "100% Natural" oats that are free of unnatural agents than they would pay for oats that are not "Natural" or "100% Natural," furthering Quaker's private interest of increasing sales of its products and decreasing the sales of the all-natural and/or glyphosate-free products that are truthfully marketed by its competitors.

97. Quaker knows that consumers prefer "Natural" and "100% Natural" foods, and foods that do not contain dangerous or potentially dangerous chemicals. Quaker knows that consumers will pay more for "Natural" or "100% Natural" foods or would not purchase the foods at all unless they were "Natural" and/or "100% Natural" and/or free from unnatural and potentially dangerous chemicals.

98. Similarly, independent surveys confirm that consumers will purchase more "Natural" products than conventional products, and will pay more for "Natural" products.

**VII.    Consumers Did Reasonably Rely on Quaker's Misrepresentations.**

99. Consumers frequently rely on label representations and information in making purchase decisions, especially in purchasing food.

100. When Plaintiff Wheeler and the Class Members purchased Quaker Oats, they saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the presence of glyphosate or any warning of the dangers associated with glyphosate, as detailed above.

101. These misrepresentations and omissions were uniform and were communicated to Plaintiff Wheeler and every other member of the Class at every point of purchase and consumption.

102.    Plaintiff Wheeler and the Class Members were among the intended recipients of Quaker's deceptive representations and omissions.

103..   Plaintiff Wheeler and the Class Members reasonably relied to their detriment on Quaker's misleading representations and omissions.

104.    Quaker's false, misleading, and deceptive misrepresentations and omissions deceived and misled, and are likely to continue to deceive and mislead, Plaintiff Wheeler, the Class Members, reasonable consumers, and the general public.

105.    Quaker's misleading affirmative statements further obscured what it failed to disclose, and the warnings it failed to give. Thus, reliance upon Quaker's misleading and deceptive representations and omissions may be presumed.

106.    Quaker made the deceptive representations and omissions with the intent to induce Plaintiff Wheeler and the Class Members to purchase Quaker Oats. Plaintiff Wheeler's and the Class Members' reliance upon such representations and omissions may be presumed.

107.    Quaker's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions. Thus, Plaintiff Wheeler's and the Class Members' reliance upon such representations and omissions may be presumed as a matter of law; the representations and omissions were material; and a nexus exists between Quaker's conduct, on the one hand, and Plaintiff Wheeler's and the Class Members' decisions to purchase Quaker Oats at a certain price, on the other hand.

VIII.    Quaker's Conduct and Plaintiff's and the Class Members' Injury.

108.    As an immediate, direct, and proximate result of Quaker's false, misleading, and deceptive representations and omissions, Quaker injured Plaintiff Wheeler and the Class Members in that they:

a.  paid a sum of money for a product that was falsely represented;

b.  paid a sum of money for a product containing glyphosate, of which they received no warning;

c.  paid more for a product that was falsely represented than they would have paid had the product not been falsely represented;

d.  were deprived the benefit of the bargain because the Quaker Oats they purchased were different from what Quaker warranted;

e.  were deprived the benefit of the bargain because the Quaker Oats they purchased had less value than what was represented;

f.  did not receive a product that measured up to their expectations as created by Quaker;

g.  ingested (or caused their children to ingest) a substance that was other than what was represented;

h.  ingested (or caused their children to ingest) a substance they did not expect or consent to;

i.  ingested (or caused their children to ingest) a product that included an unnatural substance;

j.  without their knowing consent, ingested (or caused their children to ingest) an herbicide that is harmful to their health or their children's health;

k. without their knowing consent, ingested (or caused their children to ingest) a substance that is, contains, or is produced with a known or suspected toxin, carcinogen, hazardous substance;

l. without their knowing consent, ingested (or caused their children to ingest) a substance that poses health or environmental risks;

m. without their knowing consent, ingested (or caused their children to ingest) a substance that is otherwise harmful to the environment and/or the farmers and other workers who utilize or process such substance;

n. ingested (or caused their children to ingest) a substance that was of a lower quality than what Quaker promised;

o. were denied the benefit of knowing what they ingested (or caused their children to ingest);

p. were caused unwittingly to support an industry that contributes to environmental, ecological, or health damage;

q. were denied the benefit of supporting an industry that sells natural products and contributes to environmental sustainability; and/or

r. were denied the benefit of the beneficial properties of the "Natural" products promised.

109. Had Quaker not made the false, misleading, and deceptive representations and omissions, and had Quaker not failed to warn of the presence of glyphosate and dangers associated with glyphosate, Plaintiff Wheeler and the Class Members would not have been injured as listed above. Accordingly, Plaintiff Wheeler and the Class Members have suffered "injury in fact" as a result of Quaker's wrongful conduct.

110.    Plaintiff Wheeler and the Class Members all paid money for Quaker Oats, but did not obtain the full value of the advertised products due to Quaker's misrepresentations and omissions. Plaintiff Wheeler and the Class Members purchased, purchased more of, or paid more for, Quaker Oats than they would have had they known the truth about Quaker Oats. Accordingly, Plaintiff Wheeler and the Class Members have suffered "injury in fact" and lost money or property as a result of Quaker's wrongful conduct.

IX.     **Quaker Benefited From Its Misleading Representations and Omissions.**

111.    As the intended, direct, and proximate result of Quaker's false, misleading, and deceptive representations and omissions, Quaker has been unjustly enriched through more sales of Quaker Oats and higher profits at the expense of Plaintiff Wheeler and the Class Members. As a direct and proximate result of its deception, Quaker also unfairly obtained other benefits, including the higher value associated with a "natural" brand, redirecting sales to it and away from its competitors, and increased sales of its other products.

112.    Plaintiff, and all other similarly situated consumers, did not bargain for Products that contain unnatural ingredients in exchange for their payment of the purchase price.

113.    Defendant has profited by failing to warn consumers of the presence of glyphosate in the Products or of the health effects of consuming glyphosate.

114.    Upon information and belief, Defendant has failed to remedy the problem with the Products, thus causing future harm to consumers. Plaintiff, Class Members, and future purchasers in the consuming public, are at risk of real, immediate, and continuing harm if the Products continue to be sold as is, and without adequate warning of the presence of glyphosate and of the health effects of ingesting glyphosate.

22

115. Plaintiff would continue to purchase the Products again in the future if they were reformulated so that they did not contain glyphosate.

116. Defendant has failed to provide adequate relief to the Plaintiff or Class Members as of the date of filing this Complaint.

117. Plaintiff contends that the Products were sold pursuant to unfair and unconscionable trade practices because the sale of the Products offends public policy and is immoral, unethical, oppressive, unscrupulous, and caused substantial economic injuries to Plaintiff and Class Members.

118. Reasonable consumers do not expect Products advertised as "Natural," "100% Natural," and "100% Natural Whole Grain" to contain unnatural ingredients such as glyphosate. Defendant's statements and other representations convey a series of express and implied claims and/or omissions which Defendant knows are material to the reasonable consumer in making a purchasing decision, and which Defendant intended for consumers to rely upon when choosing to purchase the Products.

119. Defendant misrepresented the nature, quality, and/or ingredients of the Products, and/or failed to adequately disclose the health risks of ingesting the glyphosate contained in the Products, which was and is false, misleading, and/or likely to deceive reasonable consumers. Reasonable consumers expect the presence of such ingredients to be disclosed so that they can make informed purchasing decisions.

120. Therefore, the Products are valueless, and not worth the purchase price that Plaintiff and Class Members paid for them, and/or are not what Plaintiff and Class Members reasonably intended to receive.

121. Accordingly, Plaintiff seeks, individually and on behalf of all other similarly situated purchasers of the Products during the Class Period, injunctive relief, and actual economic damages equaling the aggregate purchase price paid for the Products by Plaintiff and Class Members during the Class Period.

122. Plaintiff also seeks declaratory relief in the form of an order declaring Defendant's conduct to be unlawful, as well as injunctive and equitable relief putting an end to Defendant's misleading and unfair business practices, including clear and full disclosure of the presence of glyphosate in the Products and of the health effects of ingesting glyphosate and/or a reformulation of the Products so that they no longer contain glyphosate.

## CLASS ALLEGATIONS

123. Plaintiff brings this action as a class action pursuant to Illinois Code of Civil Procedure 735 ILCS 5/2-801 on behalf of herself and the following class:

> **All persons who reside in the State of Illinois and purchased Quaker Oats (as defined herein) from a retail location within the State of Illinois.**

124. The Class Period is defined to the longest extent allowed by law.

125. Excluded from the class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

126. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

A.    Numerosity

127.    Based on the annual sales of the Products and the popularity of the Products, it is readily apparent that the number of consumers in the Class is so large as to make joinder impracticable, if not impossible.

128.    The Court may ascertain the exact size of the Class and the identities of the individual members thereof through Defendant's records, which are in exclusive control of Defendant.

129.    Notice of the pendency of this action to Class members may be accomplished by techniques and forms commonly used in class actions, such as published notice, e-mail notice, website notices, first class mail, or combinations thereof, or by other methods suitable to this class and deemed necessary or appropriate by this Court.

130.    In the interest of judicial economy, the Court should determine Defendant's liability for all Class members in a single action rather than having hundreds of cases for the same claims based on the same facts pending in multiple districts across the state.

B.    Typicality

131.    Plaintiff's claims are typical of the claims of all members of the Class.

132.    Plaintiff possesses the same interest as every other Class member and has suffered the same injury as all Class members.

133.    Plaintiff's claims and the claims of each Class member are based on the same legal theories and arise from the same unlawful conduct.

134.    Plaintiff and each Class member were a customer of Defendant and received and relied upon Quaker's false and misleading statements as alleged herein.

C.      Common Questions of Law and Fact

135.    This case presents many common questions of law and fact.

136.    Common questions of law and fact to Plaintiff and the Class predominate over any questions which may affect individual members.

137.    Common questions of law and fact concerning Defendant's practices include:

a.  Whether Defendant's practices and representations related to the marketing, labeling, and sales of the Products were unfair, deceptive, fraudulent, and/or unlawful in any respect, thereby violating Illinois law;

b.  Whether Defendant failed to warn Plaintiff and Class Members of the presence of glyphosate in the Products and/or of the health effects of ingesting glyphosate in violation of Illinois law with its practices and representations related to the marketing, labeling, and sale of the Products;

c.  Whether Defendant breached an express warranty created through the labeling and marketing of its falsely labeled Products;

d.  Whether Defendant's conduct as set forth above economically injured Plaintiff and Class Members; and

e.  Whether Plaintiff and Class Members are entitled to injunctive relief.

138.    Resolving any of the above questions of law or fact common to the Class will affect all the Class members.

D.      Adequacy of Representation

139.    Plaintiff is a member of the Class as defined above.

140. Through her attorneys, Plaintiff can and will fairly, adequately, and vigorously prosecute the claims of the Class and represent and protect the interests of the members of the Class.

141. Plaintiff and the Class members purchased, purchased more of, or paid more for Quaker Oats than they would have had they known the Products were not "Natural" or "100% Natural" as labeled and marketed.

142. Plaintiff has suffered the same injury as the Class members, including, *inter alia*, paying a sum of money for a product that was falsely represented and paying a sum of money for a product containing glyphosate, of which she received no warning.

143. Plaintiff has the same interest as the Class members, including recovering moneys paid to Quaker as a result of its deceptive and misleading practices.

144. Plaintiff has no interests antagonistic to or in conflict with the members of the Class.

145. Plaintiff's counsel is able, competent, and qualified to prosecute this class action litigation on behalf of Plaintiff and the Class, having represented consumers in a wide variety of actions where they have sought to protect consumers from fraudulent and deceptive practices.

E.      **Appropriateness**

146. Because of the relatively small dollar amount of damages to each Class member, the members of the Class are not likely to be able to prosecute individual lawsuits that would cost much more in attorney's fees to bring the suit than the actual claim for recovery.

147. Proceeding as a class action in this case is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the Class. Relative to the aggregate damages that may be awarded to the Class, the members of the Class suffered

individually small damages. Therefore, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for Defendant's wrongdoing.

148.    Furthermore, individualized litigation would present the potential for varying, inconsistent, or contradictory judgments, and would likely cause delay and additional expense to all parties and the court system resulting from multiple trials of the same factual issues.

149.    Proceeding as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, and would protect the rights of each member of the Class.

150.    Plaintiff is aware of no difficulty to be encountered in managing this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATION OF ILLINOIS FOOD, DRUG, AND COSMETIC ACT

151.    Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

152.    Plaintiff and the Class are "Persons" as defined by 410 ILCS 620/2.1.

153.    Quaker Oats are "Food" as defined under 410 ILCS 620/2.3 because they are "articles used for food or drink in man[.]"

154.    Quaker Oats are "adulterated" foods as defined under 410 ILCS 620/10 because they "bear[] or contain[] any poisonous or deleterious substance which may render [them] injurious to health[.]"

155.    Quaker Oats are "contaminated with filth" as defined under 410 ILCS 620/2.15 because they are "not securely protected ... as far as may be necessary by all reasonable means, from all foreign or injurious contaminations."

156.    Quaker Oats are "misbranded" as defined under 410 ILCS 620/2.11 because the labeling or advertisement of the products:

a.  Is misleading in light of the representations made or suggested by statement, word, design, device, sound, or any combination thereof;

b.  Fail to reveal material facts in the light of the representations made or suggested by statement, word design, device, sound, or any combination thereof;

c.  Fail to reveal material facts with respect to the consequences which may result from the use of the products to which the labeling or advertisement related under the conditions of use prescribed in the labeling or advertisement thereof or under such conditions or use as are customary and usual.

157.    Quaker's sale of Quaker Oats violates one or more enumerated acts prohibited under 410 ILCS 620/3, including, but not limited to:

a.  The manufacture, sale, delivery, holding, or offering for sale any food that is adulterated or misbranded;

b.  The adulteration or misbranding of any food;

c.  The receipt in commerce of any food that is adulterated or misbranded and the delivery or proffered delivery thereof for pay or otherwise; and

d.  The dissemination of any false advertisement.

158.    As a direct and proximate result of Quaker's wrongful conduct and violations of 410 ILCS 620, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## <u>VIOLATION OF ILLINOIS CONSUMER FRAUD AND</u>
## <u>DECEPTIVE BUSINESS PRACTICES ACT</u>

159. Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

160. Quaker is a "person[s]" as that term is defined in 815 ILCS 505/1(c).

161. Plaintiff and the Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

162. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of trade or commerce ... whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

163. Quaker has violated the Illinois CFA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers. Specifically, Quaker has misrepresented the true nature, quality, and ingredients of the Products and failed to adequately warn of and disclose the presence of glyphosate in the Products and/or the health effects of ingesting glyphosate, thereby disseminating representations or omissions that are false, deceptive, and likely to mislead a reasonable consumer, such as Plaintiff and Class Members.

164.    Quaker misrepresented and/or omitted facts about the presence of glyphosate in the Products and the health effects of ingesting glyphosate, which were and are material to Plaintiff's and Class Members' decisions to purchase the Products.

165.    Quaker's sale of the Products is an unfair method of competition, unconscionable act and practice, and an unfair and deceptive act and practice in the conduct of its business.

166.    As a result of Quaker's deceptive and unfair acts, Plaintiff and Class Members have been damaged in the amount of the aggregate retail sales of the Products throughout the Class Period.

167.    Quaker's conduct offends established public policy, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

168.    Quaker should also be ordered to cease and/or continue ceasing its deceptive and unfair advertising, and should be made to engage in a corrective advertising campaign, to inform consumers of the presence of glyphosate in the Products and the health effects of ingesting glyphosate.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

169.    Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

170.    Throughout the Class Period, Quaker made incorrect representations and/or omissions of fact regarding the Products.

171.    Quaker advertised, labeled, packaged, marketed, distributed, and sold the Products, without adequately warning Plaintiff and Class Members of the presence of glyphosate in the Products and/or the health effects of ingesting glyphosate on media such as on the Products' packaging and labeling. Further, Quaker represents that the Products are "Natural,"

"100% Natural," and "100% Natural Whole Grain" despite the presence of glyphosate, a synthetic biocide.

172.     Quaker was negligent in making the misrepresentations and/or omissions at issue because they knew, or should have known, that the Products contain glyphosate.

173.     Plaintiff and Class Members relied on Quaker's misrepresentations and/or omissions in purchasing the Products they believed did not synthetic or unnatural ingredients, or anything other than "100% Natural Whole Grain."

174.     The factual misrepresentations and/or omissions committed by Quaker were material to Plaintiff and Class Members in making their purchases of the Products.

175.     Plaintiff and other Class Members relied upon the incorrect representations and/or omissions made about the Products to their detriment, in that Plaintiff and other Class Members paid the purchase price for the Products based upon the incorrect representations and/or omissions, and had Plaintiff and Class Members known the truth about the Products, they would not have purchased the Products.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

176.     Plaintiff repeats and realleges the allegations set forth above as if fully contained herein

177.     Quaker provided Plaintiff Wheeler and other members of the Class with written express warranties including, but not limited to, warranties that Quaker Oats were "Natural," "100% Natural," and "100% Natural Whole Grain."

178.     These affirmations of fact or promises by Quaker relate to the goods and became part of the basis of the bargain.

179. Plaintiff Wheeler and members of the Class purchased Quaker Oats believing them to conform to the express warranties.

180. Quaker breached these warranties. This breach resulted in damages to Plaintiff Wheeler and other members of the Class, who bought Quaker Oats but did not receive the goods as warranted.

181. As a proximate result of the breach of warranties by Quaker, Plaintiff Wheeler and the other members of the Class did not receive goods as warranted. Plaintiff Wheeler and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial. Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiff Wheeler and the Class members known the true facts, they would not have purchased Quaker Oats, or would have purchased Quaker Oats on different terms.

## FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT

182. Plaintiff repeats and realleges the allegations set forth above as if fully contained herein and in the alternative to warranty and contract-based causes of action

183. As a result of Quaker's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of Quaker Oats, Quaker was enriched at the expense of Plaintiff Wheeler and the other members of the Class through the payment of the purchase price, or for the payment of a price higher than otherwise would have been paid, for Quaker Oats.

184. As a result of Quaker's failure to warn about the presence of glyphosate and about the dangers associated with glyphosate, Quaker was enriched at the expense of Plaintiff Wheeler and the other members of the Class through the payment of the purchase price, or for the payment of a price higher than otherwise would have been paid, for Quaker Oats.

185.    Under the circumstances, it would be against equity and good conscience to permit Quaker to retain the ill-gotten benefits that it received from Plaintiff Wheeler and the other members of the Class, in light of the fact that the Quaker Oats purchased by Plaintiff Wheeler and the other members of the Class were not what Quaker purported them to be. Thus, it would be unjust or inequitable for Quaker to retain the benefit without restitution to Plaintiff Wheeler and the other members of the Class for the monies paid to Quaker for Quaker Oats.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment against Defendant as follows:

A.      Determining that the action is a proper class action maintainable under 735 ILCS 5/2-801; certifying Plaintiff as class representative; and appointing Plaintiff's counsel as counsel for the Class;

B.      A declaration that Defendant is financially responsible for notifying members of the Class of the pendency of this suit;

C.      An order declaring Defendant's conduct to be in violation of applicable law and enjoining Defendant from pursuing the unlawful acts and practices alleged herein by adequately disclosing the presence of glyphosate in the Products and of the health effects of ingesting glyphosate;

D.      An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendant as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

E.      An order requiring Defendant to pay full restitution to Plaintiff and all Class Members;

F.     An order requiring Defendant to engage in a corrective advertising campaign to inform the public concerning the true nature of Quaker Oats, including a recall of the products;

G.     An order requiring Defendant to disgorge all ill-gotten gains flowing from the conduct alleged in this Complaint;

H.     An order awarding Plaintiff and the Class economic, actual, and compensatory damages, and all such other statutory and common law damages permitted by law, in such amount as may be determined at trial for the claims asserted herein;

I.     An order enjoining the Defendant from continuing the unlawful practices alleged herein; and

J.     An order awarding Plaintiff and the Class pre- post-judgment interest, costs, and reasonable attorneys' fees for prosecuting this action.

K.     Such other and further relief as may be deemed just, necessary, or proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 2, 2016     Respectfully submitted,

         SABRINA WHEELER, individually and on behalf
         of all others similarly situated, Plaintiff.

         Edward A. Wallace
         Email: eaw@wexlerwallace.com
         Amy E. Keller
         Email: aek@wexlerwallace.com
         **WEXLER WALLACE LLP**
         55 West Monroe Street, Suite 3300
         Chicago, Illinois 60603
         Telephone: (312) 346-2222
         Facsimile: (312) 346-0022
         Firm No. 49718

Kim E. Richman
**THE RICHMAN LAW GROUP**
Email: krichman@richmanlawgroup.com
81 Prospect Street
Brooklyn, New York 11201
Telephone: (212) 687-8291
Facsimile: (212) 687-8292

Beth E. Terrell
Email: bterrell@terrellmarshall.com
Erika L. Nusser
Email: enusser@terrellmarshall.com
**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

John W. Barrett
Email: jbarrett@baileyglasser.com
**BAILEY & GLASSER LLP**
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110

*Attorneys for Plaintiff Wheeler and the Proposed Class*



# EXHIBIT 1







